IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA   RECEIVED
NORTHERN DIVISION

2017 MAY 30  P 1:56

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

FORWARD MOMENTUM, LLC,
F/K/A FORWARD MOMENTUM,
INC., A/K/A FORWARD MOTION,
INC., ARGO CONSULTING, PC,
LISA M. BUNDY, MD, LLC, DR.
STEVEN BOBO; DR. NICHOLAS J.
MANZARI, JR., DR. RAYMOND J.
MAGUIRE, DR. LANDON E. ARGO,
DR. NIMA BAHRAINI, DR. DAWN
DONALD, DR. ROGER D. EILAND,
and DR. LISA M. BUNDY;

Plaintiffs,

v.

TEAM HEALTH, INC.; and
PARAGON CONTRACTING
SERVICES, LLC, F/K/A PARAGON
CONTRACTING SERVICES, INC.,
D/B/A TEAM PRIMARY CARE
PHYSICIANS OF ALABAMA, INC.;

Defendants.

Civil Action No.:
2:17-CV-346

DEMAND FOR JURY TRIAL

## COMPLAINT

COME NOW Plaintiffs, Forward Momentum, LLC, f/k/a Forward Momentum, Inc. a/k/a Forward Motion, Inc., Argo Consulting, PC, Lisa M. Bundy, MD, LLC, Dr. Steven Bobo, Dr. Nicholas J. Manzari, Jr., Dr. Raymond J. Maguire, Dr. Landon E. Argo, Dr. Nima Bahraini, Dr. Dawn Donald, Dr. Roger D. Eiland and Dr. Lisa M. Bundy, on behalf of themselves and others similarly situated

(collectively, "Plaintiffs"), and bring this civil action to recover damages against the above-named Defendants, and for their causes of action would show unto the Court the following, to wit:

1. Plaintiff Forward Momentum, LLC, is an Alabama limited liability company, formerly known as Forward Momentum, Inc. an Alabama corporation. Plaintiff Dr. Dawn Donald is its President. In its contract with Defendants, Forward Momentum, Inc.'s name was written as "Forward Motion, Inc."

2. Plaintiff Argo Consulting, PC, is an Alabama professional corporation. Plaintiff Dr. Landon E. Argo is its President.

3. Plaintiff Lisa M. Bundy, MD, LLC, is an Alabama limited liability company. Plaintiff Lisa M. Bundy is its managing member.

4. Plaintiff Dr. Steven Bobo is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

5. Plaintiff Dr. Nicholas J. Manzari, Jr., is over the age of nineteen (19) years, and is a resident of Montgomery County, Alabama.

6. Plaintiff Dr. Raymond J. Maguire is over the age of nineteen (19) years, and is a resident of Mobile County, Alabama.

7. Plaintiff Dr. Landon E. Argo is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

8. Plaintiff Dr. Nima Bahraini is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

9. Plaintiff Dr. Dawn Donald is over the age of nineteen (19) years, and is a resident of Chilton County, Alabama.

10. Plaintiff Dr. Roger D. Eiland is over the age of nineteen (19) years, and is a resident of Shelby County, Alabama.

11. Plaintiff Dr. Lisa M. Bundy is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

12. Upon information and belief, Defendant Team Health, Inc. (hereinafter "Team Health") is a Tennessee corporation with its principal place of business in Knoxville, Tennessee. Team Health was doing business in the State of Alabama at all times material herein.

13. Upon information and belief, Defendant Paragon Contracting Services, LLC, f/k/a Paragon Contracting Services, Inc., d/b/a Team Primary Care Physicians of Alabama, Inc. (hereinafter "Paragon") is a Florida limited liability company with its principal mailing address in Knoxville, Tennessee. Paragon was doing business in the State of Alabama at all times material herein. Upon information and belief, Paragon operates under Team Health's dominion and control and at Team Health's direction.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the individual claims under 28 U.S.C. § 1332 because there is diversity of citizenship and an amount in controversy greater than $75,000. This Court also has jurisdiction over Count Three of Plaintiffs' claims pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

15. This Court has jurisdiction over the class claims under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts over any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

16. Plaintiffs allege that the total claims of the individual members of the proposed Plaintiff Class are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2) and (5). As set forth below, Plaintiffs are citizens of Alabama, and Defendants can be considered citizens of Tennessee and Florida. Therefore, diversity of citizenship exists under CAFA and diversity jurisdiction, as required by 28 U.S.C. §§ 1332(a)(1) and (d)(2)(A).

17. Furthermore, Plaintiffs allege on information and belief that more than two-thirds of all the members of the proposed Plaintiff Class in the aggregate are

citizens of states other than Alabama, and that the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

18. Venue is proper pursuant to 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to this complaint happened in this district, or alternatively, because at least one defendant is subject to the court's personal jurisdiction with respect to such action.

## STATEMENT OF FACTS

### A. Background

19. Team Health is a national multi-billion dollar staffing company. Team Health, through its subsidiaries such as Paragon, has contracted with approximately 3,900 independent contractor physicians (including Plaintiffs) in as many as 47 states to handle emergency care at approximately 3,300 hospitals across the country, collectively referred to as "Team Health Facilities" or "TH Facilities." Because Defendants signed exclusive contracts with the TH Facilities, emergency care physicians cannot contract with the TH Facilities directly. The physicians must contract with Defendants in order to work in the emergency rooms of the TH Facilities. In addition to physicians, Team Health contracts with physician assistants and nurse practitioners (collectively referred to as "advance practice clinicians" or "APCs") to treat patients under a physician's direction.

20. Under Defendants' contracts with the TH Facilities and Plaintiffs, referred to as Medical Professional Independent Contractor Agreements, Defendants

make money based on the number of patients each physician is responsible for during his/her shift, and the services provided to each patient. Defendants make less money on a physician if he/she is unproductive on duty. Conversely, Defendants make more money on a physician if he/she is industrious and takes on responsibility for more patients.

21.  TH Facilities include, among many others: DCH Regional Medical Center in Tuscaloosa, Alabama and Northport Medical Center in Northport, Alabama (both hospitals are part of the DCH Health System and are collectively referred to as "DCH"); Baptist Medical Center South and Baptist Medical Center East in Montgomery, Alabama, and Prattville Baptist Hospital in Prattville, Alabama (these three hospitals are part of the Baptist Health System and are collectively referred to as "Baptist"); and St. Vincent's Birmingham ("SVB"). TH provides emergency medical services through the following administrative offices located in eleven regional sites: Premier Team Health in Dayton, Ohio; TeamHealth Atlantic in Knoxville, Tennessee; TeamHealth Central in Chicago, Illinois and Lexington, Kentucky; TeamHealth Mid-Atlantic in Knoxville, Tennessee; TeamHealth Northeast in Middlebury Heights, Ohio and Woodbury, New Jersey; TeamHealth Southeast in Plantation, Florida; and TeamHealth West in Oklahoma City, Oklahoma, Pleasanton, California and Seattle, Washington.

## B. The RVU Bonus Program

22. At least as early as 2012, Defendants sought to add a bonus program to the contracts of the physicians at TH Facilities in order to incentivize the physicians to take on responsibility for more patients during each shift, so Defendants could bill more and make more money. This program was motivated by the need to attract and retain the best possible physicians to the TH Facilities and their markets, and was presented to the physicians as a way for them to make more money as well.

23. Defendants' bonus system relies on "relative value units" ("RVUs") to determine the amount of each physician's bonus. RVUs assign a value to each service provided and the resources used to provide that service. The RVUs used by Defendants are based on a similar system initially set up by Medicare to help it determine how much to reimburse healthcare providers when the provider bills Medicare for services.

24. RVUs are generated when physicians see the patients directly and when they supervise APCs who treat patients under the physician's direction. RVUs generated through Plaintiffs' supervision of APCs are referred to as "Assisting RVUs." Receiving bonus credit for the Assisting RVUs is critically important to the physicians at the TH Facilities.

## C. The Importance of Assisting RVUs

25. The importance of physician credit for Assisting RVUs is easiest understood in the context of patient charts and the liability risk that physicians assume in signing those charts. A physician is responsible for every patient whose chart he/she signs, whether he/she sees the patient directly or simply supervises an APC's treatment plan.

26. At TH facilities, every patient chart requires a physician to sign his/her name, attesting to the fact that he/she is taking personal responsibility for the patient's treatment. These physician signatures also allow Defendants to increase their billing and collections with various insurers.

27. If a physician sees a patient directly, Team Health used the following default attestation in the patient's chart:

> I personally evaluated and examined the patient in conjunction with the MLP [("Mid Level Provider")] and agree with the assessment and treatment plan and disposition of the patient as recorded by the MLP.

(An MLP is the same thing as an APC.)

28. When an APC sees a patient under the physician's direction, the physician is responsible for the patient's diagnosis and treatment, and either works with the APC to formulate a treatment plan, or, if the APC has already created a treatment plan, review and make changes to the plan to ensure that it is appropriate.

In this situation, Team Health uses a different default attestation in the patient's chart, which reads as follows:

> I was personally available for consultation in the emergency department. I have reviewed the chart and agree with the documentation as recorded by the MLP, including the assessment, treatment plan and disposition.

29. A physician signs an attestation on every patient chart, including charts where he/she assisted the APC but did not see the patient directly.

30. Regardless of whether or not a patient is directly seen by a physician, the patient's chart and attestations therein, as well as the contracts discussed below, all recognize that a physician takes on considerable responsibility for every patient's diagnosis, treatment and disposition, and that he/she spends significant time assisting patients by consulting with APCs and reviewing patient charts.

31. Physicians can be held liable for the treatment provided to a patient, regardless of whether the physician saw the patient directly or supervised the APC's treatment plan. In fact, multiple Plaintiffs have been sued because they supervised an APC and signed off on patient charts.

32. For that reason, when Defendants recruited Plaintiffs to participate in the RVU bonus program, Plaintiffs were assured that, along with the liability they were assuming, they would receive credit for RVUs generated through their supervision of APCs.

33. Although Defendants represented to Plaintiffs that Plaintiffs would be paid bonus credit for RVUs earned by assisting and supervising APCs, they have failed and refused to pay Plaintiffs accordingly.

### D. The Contracts

34. Defendants were required to give Plaintiffs RVU bonus credit for Assisting RVUs under the terms of the Baptist contracts.

35. The contracts Plaintiffs entered into with Defendants provided RVU credit for supervision of APCs. According to the contracts,

> Company shall pay to Professional ... incentive compensation equal to the RVU Multiplier times the applicable Relative Value Unit ("RVU") **for the services provided by Professional** during Company's last billing cycle which closed prior to Company's applicable payroll processing date, provided that billing cycle began on or after the RVU Effective Date.

(Taken from one of the Baptist contracts, but all have similar or identical language (emphasis added)).

36. Moreover, Plaintiffs' contracts make clear that the "services provided by the Professional" include supervision of APCs:

> If required by Company, Professional **shall provide supervision for advanced practice clinicians**, such as but not limited to physician assistants and advanced registered nurse practitioners ... .

(Taken from one of the Baptist contracts, but all have similar or identical language (emphasis added)).

37. Under Plaintiffs' contracts, Defendants have no discretion in how they count or credit the RVUs; they cannot refuse to count the Assisting RVUs or fail to credit them toward Plaintiffs' total RVUs.

### E. Defendants' Breach

38. Plaintiffs believed that the data on their weekly paychecks and paystubs reflected bonus credit for the RVUs generated through every chart they signed.

39. However, Defendants were secretly subtracting out the Assisting RVUs from the bonus credit on each paycheck, but failing to disclose this fact or provide Plaintiffs with sufficient data to figure out the truth.

40. Defendants represented to Plaintiffs that they would receive bonus compensation for all RVUs generated through the services they provided and that the services they were required to provide included supervision of APCs. Each Baptist Plaintiff relied on these representations in joining and remaining at Baptist.

41. Because the Baptist contracts required Plaintiffs to supervise APCs and promised to compensate them with a bonus for their provision of those services, Plaintiffs believed the numbers and amounts on their paychecks accurately represented full compensation for Assisting RVUs.

42. In actuality, the Assisting RVUs were being subtracted from Plaintiffs' bonus calculations.

43. Because the underlying data was hidden from Plaintiffs, they could not determine that they were being cheated. However, Defendants recently admitted that it is their policy not to pay Assisting RVUs in the Southeast region. Despite admitting that they are not paying for Assisting RVUs, Defendants have persisted in their scheme to defraud Plaintiffs and have not paid back the bonus money taken or corrected the problem moving forward.

## CLASS ALLEGATIONS

44. Plaintiffs bring this class action against Plaintiffs pursuant to Fed. R. Civ. P. 23, on behalf of:

> All physicians who: (a) provided emergency medicine services at current or prior TH Facilities, pursuant to Medical Professional Independent Contractor Agreements that contained contract language identical to or similar to the language cited in paragraphs 56 and 57, i.e., that provide bonus credit for physician services and require oversight of APCs but do not explicitly exclude bonus credit for RVUs generated through oversight of APCs; (b) provided assistance and supervision to said APCs, and (c) have not been given bonus credit for those RVUs.

45. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at the present time, it is estimated that there are thousands of members in the Class.

46. Despite the numerical size of the Class, the identities of the Class members can be ascertained by Defendants' employment, contract, and accounting

records. Plaintiffs and their counsel do not anticipate any difficulties in the management of this action as a class action.

47. Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs are committed to vigorously prosecute this action and have retained competent counsel experienced in class action litigation. Plaintiffs are Class members and have no interests antagonistic to or in conflict with other Class members. Plaintiffs are represented by lawyers who have had extensive experience in prosecuting class actions and will adequately represent the purported Class in this action.

48. This action raises numerous questions of law and fact common to the Class members, including: Defendants had a duty to speak the truth but intentionally, recklessly, or innocently misrepresented to Plaintiffs the following:

   a. Whether Defendants had a policy or internal guideline against giving bonus credit for Assisting RVUs, in whole or in part;

   b. Whether Defendants required physicians to supervise work performed by APCs when APCs were present in an emergency department;

   c. Whether Defendants required physicians to sign some or all charts for patients seen by APCs;

   d. Whether Defendants had a duty to disclose to physicians that they were not being given bonus credit for Assisting RVUs;

  e. Whether Defendants suppressed the fact that they were subtracting Assisting RVUs from bonus credit; and

  f. Whether Defendants had a contractual duty to give bonus credit for Assisting RVUs unless they were contractually excluded from the RVU bonus plan.

49. The claims or defenses of the represented parties are typical of the claims or defenses of the Class. Plaintiffs have the same interests as the other Class members in prosecuting the claims against Plaintiffs. Plaintiffs and all the members of the Class sustained damages as a result of Defendants' wrongful conduct.

50. Additionally, Plaintiffs have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Common issues predominate. Furthermore, the expense and burden of individual litigation make it extraordinarily difficult for Class members to redress the wrongs done to them individually.

51. Plaintiffs also seek certification of a subclass for the equitable relief alleged in Count Three below.

## COUNT ONE
## BREACH OF CONTRACT

52. Plaintiffs re-allege all of the allegations in the preceding paragraphs as if set out in full herein.

53. Plaintiffs each entered into a valid contract binding on the parties.

54. Plaintiffs performed under the contracts serving patients in the emergency room at TH Facilities for all or part of the preceding six (6) years.

55. Plaintiffs earned RVU bonuses under the terms of the contracts that Defendants failed to pay.

56. As a proximate result, Plaintiffs were damaged.

WHEREFORE, Plaintiffs demand judgment against Plaintiffs for damages, including legal fees and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama and the United States of America.

## COUNT TWO
## UNJUST ENRICHMENT (Individual Plaintiffs Only)

57. Plaintiffs re-allege all of the allegations in the preceding paragraphs as if set out in full herein.

58. Defendants wrongfully retained a benefit from Plaintiffs.

59. It is unjust and inequitable for Defendants to withhold bonus compensation owed to Plaintiffs for the supervision and assistance that they provided.

60. Defendant knowingly, intentionally and fraudulently failed to compensate Plaintiffs for the benefit conferred.

61. As a proximate result, Plaintiffs were damaged.

WHEREFORE, Plaintiffs demand judgment against Defendants for disgorgement, legal fees, and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama and the United States of America.

## COUNT THREE
## DECLARATORY JUDGMENT

62. Plaintiffs re-allege all of the allegations in the preceding paragraphs as if set out in full herein.

63. This Count is brought to determine the rights and duties of the Parties under various Medical Professional Independent Contractor Agreements described in paragraph 44 above.

64. A controversy exists between the Parties and Class members as to Plaintiffs' rights to bonus compensation for assistance and supervision of APCs as described in paragraph 24 above.

WHEREFORE, Plaintiffs request this Court to issue an Order indicating that this is a proper case for declaratory judgment relief, that there is a bona fide controversy among the Parties and, that upon final hearing, the Court will declare that Plaintiffs and Class members are entitled to bonus compensation for assistance and supervision of APCs, legal fees and costs and such other relief as they are entitled.

Floyd D. Gaines
Daniel B. Snyder


**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL ISSUES RAISED HEREIN.**

Floyd D. Gaines
Daniel B. Snyder

OF COUNSEL:
GAINES LLC
2160 Highland Avenue South, Suite 101
Birmingham. AL 35205
fgaines@gainesllc.com
dsnyder@gainesllc.com
Office Number:         205.598.5055
Fax Number:            205.598.5066
Floyd Gaines Direct:   205.598.5089
Daniel Snyder Direct:  205.598.5076

PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL:

Team Health, Inc.
c/o The Prentice-Hall Corporation System, Inc.
2908 Poston Ave.
Nashville, TN 37203-1312

Paragon Contracting Services, LLC
c/o Registered Agent: CSC Lawyers Incorporating Svc Inc.
150 S Perry St.
Montgomery, AL 36104